### In re SOFTWARE TOOLWORKS INC. Securities Litigation.

**Richard B. DANNENBERG, On Behalf of Himself and all others Similarly Situated, Plaintiff,**

**and**

**Mindy Blitz, Eugene Costiglio, Kenneth H. Ross, Homer Fleisher, Steven G. Cooperman, Nathaniel Orme, Ervin H. Fishman, Frederick Wertheimer, Barbara Wertheimer, William J. Bing, Arlene S. Bing, trustees of William J. Bing and Arlene S. Bing Living Trust, Anthony D. Shapiro, William Dulude, H.N. Brown, Jr., David E. Lockrow, Karl E. Bauman, Lucille C. Bauman, and Jack Schnitzer, Plaintiffs–Appellants,**

**v.**

**PAINEWEBBER INC., Montgomery Securities and Deloitte & Touche, Defendants–Appellees.**

**No. 94–16150.**

United States Court of Appeals, Ninth Circuit.

Submitted Aug. 23, 1994.\*

Decided Oct. 19, 1994.

Amended March 13, 1995.

ment. Fed.R.App.P. 34(a); 9th Cir.R. 34–4.

Leonard B. Simon and Alan Schulman, Milberg Weiss Bershad Spechthrie & Lerach, San Diego, CA; Sherrie R. Savett, Berger & Montague, Philadelphia, PA; Ronald Litowitz, Bernstein Litowitz Berger & Grossmann, New York City for plaintiffs-appellants.

Leslie G. Landau, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for defendant-appellee Deloitte & Touche.

Boris Feldman, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for defendants-

appellees Montgomery Securities and Paine-Webber.

William F. Alderman, Orrick, Herington & Sutcliffe, San Francisco, CA, for amicus curiae.

Before: LAY,** HALL, and THOMPSON, Circuit Judges.

### ORDER

The Opinion filed October 19, 1994 [38 F.3d 1078] is amended as follows: At page 12816 [1091], second full paragraph, delete the second and third sentences and replace with the following:

Only four of Toolworks's actual OEM contracts, however, contained such language. Because only a small portion of the total OEM contracts included the "model" language, Deloitte should have known that the model agreement was false and misleading, and inclusion of the model agreement in the July 1 SEC letter gives rise to a reasonable inference that Deloitte knew or recklessly disregarded this falsehood.

The motion by the National Association of Securities and Commercial Lawyers for leave to file an amicus curiae brief in support of appellants' petition for rehearing is DENIED.

The panel has voted unanimously to deny appellants' petition for rehearing, appellees' Montgomery Securities and PaineWebber Incorporated's petition for rehearing, and appellee Deloitte & Touche LLP's petition for rehearing. Judges Hall and Thompson have voted to reject the suggestions for rehearing en banc and Judge Lay has recommended rejection.

The full court has been advised of the suggestions for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed.R.App.P. 35.

** The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

The petitions for rehearing are DENIED and the suggestions for rehearing en banc are REJECTED.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

In this case, we again consider the securities-fraud claims raised by disappointed investors in Software Toolworks, Inc., who appeal the district court's summary judgment in favor of auditors Deloitte & Touche and underwriters Montgomery Securities and PaineWebber, Inc. We affirm in part, reverse in part, and remand.

### I.

In July 1990, Software Toolworks, Inc., a producer of software for personal computers and Nintendo game systems, conducted a secondary public offering of common stock at $18.50 a share, raising more than $71 million. After the offering, the market price of Toolworks' shares declined steadily until, on October 11, 1990, the stock was trading at $5.40 a share. At that time, Toolworks issued a press release announcing substantial losses and the share price dropped another fifty-six percent to $2.375.

The next day, several investors ("the plaintiffs") filed a class action alleging that Toolworks, auditor Deloitte & Touche ("Deloitte"), and underwriters Montgomery Securities and PaineWebber, Inc. ("the Underwriters") had issued a false and misleading prospectus and registration statement in violation of sections 11 and 12(2) of the Securities Act of 1933 ("the 1933 Act") and had knowingly defrauded and assisted in defrauding investors in violation of section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 ("the 1934 Act"). Specifically, the plaintiffs claimed that the defendants had (1) falsified audited financial statements for fiscal 1990 by reporting as revenue sales to original equipment manufacturers ("OEMs") with whom Toolworks had no binding agreements, (2) fabricated large consignment sales in order for Toolworks to meet financial projections for the first quarter of fiscal 1991 ("the June quarter"), and (3) lied to the Securities

Exchange Commission ("SEC") in response to inquiries made before the registration statement became effective.

Toolworks and its officers quickly settled with the plaintiffs for $26.5 million. After the completion of discovery, the district court granted summary judgment in favor of the Underwriters on all claims and in favor of Deloitte on all claims other than one cause of action under section 11. *See In re Software Toolworks, Inc. Sec. Litig.*, 789 F.Supp. 1489 (N.D.Cal.1992) [*Toolworks I*]. The district court held that (1) the Underwriters had established a "due diligence" defense under sections 11 and 12(2) as a matter of law, *id.* at 1494–98, (2) Deloitte had made no material misrepresentations or omissions, other than the OEM revenue statements, on which liability under sections 11 and 12(2) could attach, *id.* at 1510–11, and (3) the plaintiffs had failed to establish that any defendant acted with scienter, a necessary element of liability under section 10(b), *id.* at 1498–1510.

The plaintiffs dropped their remaining section 11 claim (regarding OEM revenue) against Deloitte and filed a timely appeal. We dismissed for lack of jurisdiction because the plaintiffs had failed to obtain Rule 54(b) certification to appeal the district court's nonfinal order. *See Dannenberg v. Software Toolworks, Inc.*, 16 F.3d 1073 (9th Cir.1994) [*Toolworks II*]. The district court subsequently entered a Rule 54(b) order and the merits of the plaintiffs' appeal is now properly before us.

■ "We conduct *de novo* review of the district court's grant of summary judgment. In so doing, we are mindful that, although materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact, summary judgment may be granted in appropriate cases. Summary judgment may be defeated in a securities fraud derivative suit only by showing a genuine issue of fact with regard to a particular statement by the company [or its professionals]. . . ." *Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.)*, 35 F.3d 1407, 1412 (9th Cir.1994), (citations and quotations omitted) [*WOW II*].

## II.

We first address the plaintiffs' claims against the Underwriters under sections 11 and 12(2) of the 1933 Act.[1] Section 11 imposes liability "[i]n case any part of [a] registration statement ... contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Similarly, section 12(2) imposes liability for using a prospectus "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." *Id.* § 77*l* (2).

Liability under sections 11 and 12(2) properly may fall on the underwriters of a public offering. *See id.* §§ 77k(a)(5), 77*l* (2). Underwriters, however, may absolve themselves from liability by establishing a "due diligence" defense. Under section 11, underwriters must prove that they "had, after reasonable investigation, reasonable ground to believe and did believe ... that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Id.* § 77k(b)(3). Similarly, under section 12(2), underwriters must show that they "did not know, and in the exercise of reasonable care, could not have known, of [the] untruth or omission." *Id.* § 77*l* (2).

■ Because section 11's "reasonable investigation" standard is similar, if not identical, to section 12(2)'s "reasonable care" standard, *see Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1228 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981), the analysis of each on summary judgment is the same, *see Weinberger v. Jackson,* [1990–91] Fed.Sec.L.Rep. (CCH) ¶ 95,693 at 98,255, 1990 WL 260676 (N.D.Cal. 1990). In determining whether an underwriter meets the due diligence test under either provision, "the standard of reasonableness shall be that required of a prudent man

in the management of his own property." 15 U.S.C. § 77k(c); *see* 17 C.F.R. § 230.176 (factors affecting the reasonableness of an investigation under section 11). Thus, due diligence is, "[i]n effect, ... a negligence standard." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 208, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1975).

The district court held that the Underwriters had established due diligence as a matter of law and, accordingly, issued summary judgment against the plaintiffs on the section 11 and 12(2) claims. On appeal, the plaintiffs contend that due diligence is so fact-intensive that summary judgment is inappropriate even where underlying historical facts are undisputed. The plaintiffs further contend that, in any event, the district court erred by ignoring disputed issues of material fact in this case. We hold that, in appropriate cases, summary judgment may resolve due diligence issues but that, in this case, the district court erred by granting summary judgment in favor of the Underwriters on several claims.

### A.

■ The plaintiffs first argue that "due diligence ... [and] the reasonableness of the defendants' investigation ... is a question for the jury, even on undisputed facts." We agree, of course, that summary judgment is generally an inappropriate way to decide questions of reasonableness because "the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment." *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 450 n. 12, 96 S.Ct. 2126, 2133 n. 12, 48 L.Ed.2d 757 (1976). We have, however, squarely rejected the contention that "reasonableness is *always* a question of fact which precludes summary judgment." *West v. State Farm Fire & Casualty Co.,* 868 F.2d 348, 350 (9th Cir.1989) (emphasis added). Rather, reasonableness "becomes a question of law and loses its triable character if the undisputed facts leave no room for a reasonable differ-

---

1. The plaintiffs do not appeal the district court's partial summary judgment in favor of Deloitte on the section 11 and 12(2) claims.

ence of opinion." *Id.* Accordingly, "reasonableness [is] appropriate for determination on [a] motion for summary judgment when only one conclusion about the conduct's reasonableness is possible." *Id.* at 351. *See TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2133 (summary judgment proper where "reasonable minds cannot differ") (internal quotation omitted).

Courts therefore may resolve questions of due diligence in those cases where no rational jury could conclude that the defendant had not acted reasonably. Several courts have, in fact, done just that. *See Weinberger,* ¶ 95,693 at 98,255 (summary judgment in favor of underwriters); *In re Avant–Garde Computing, Inc. Sec. Litig.*, No. 85–4149 (AET), 1989 WL 103625 at *7–*9 (D.N.J. Sept. 5, 1989) (summary judgment in favor of outside director); *Laven v. Flanagan,* 695 F.Supp. 800, 811–12 (D.N.J.1988) (summary judgment in favor of outside directors); *cf. Bamco 15 v. Buchanan Residential Real Estate Ltd. Partnership,* [1986–87] Fed.Sec. L.Rep. (CCH) ¶ 93,062 at 95,285–86, 1986 WL 15333 (S.D.N.Y.1986) (summary judgment in favor of *plaintiff* where defendant produced no evidence of due diligence).

The district court, therefore, properly held that "the adequacy of due diligence may be decided on summary judgment when the underlying historical facts are undisputed." *Toolworks I,* 789 F.Supp. at 1496.

### B.

The plaintiffs next assert that, even if summary judgment may resolve due diligence issues in some cases, the district court erred in this case because three "hotly disputed" issues of material fact preclude summary judgment on the question of the Underwriters' due diligence. We consider each in turn.

### 1.

■ The plaintiffs first argue that the Underwriters failed to investigate properly Toolworks' Nintendo business. Specifically, the plaintiffs assert that the Underwriters should have discovered that, in contravention of statements in the prospectus, Toolworks had lowered prices on its Nintendo games and had "sold" significant inventory on a consignment basis, giving buyers an unqualified right to return unsold merchandise. *See WOW II,* 35 F.3d at 1418 ("a company that substantially overstates its revenues by reporting consignment transactions as sales makes false or misleading statements of material fact") (quotations omitted).

The district court disagreed, noting that the Underwriters had obtained written representations from Toolworks and Deloitte that the prospectus was accurate, had confirmed with Toolworks' customers that the company did not accept returns of non-defective cartridges, and had surveyed retailers to ensure that the company had not lowered its prices. *Toolworks I,* 789 F.Supp. at 1497. Thus, the court concluded that the Underwriters had, as a matter of law, "performed a thorough and reasonable investigation of Toolworks' Nintendo business." *Id.* For the following reasons, we agree.

### a.

■ The plaintiffs argue that the prospectus was false and misleading because it stated that Toolworks' "Nintendo software products have not been subject to price reductions," when, in fact, Toolworks had begun a price-cutting promotion days before the offering. The plaintiffs, however, presented no direct evidence that the Underwriters knew of this promotion. Indeed, the record illustrates that Toolworks' management consistently assured the Underwriters that the company would not reduce prices. [*See* ER 279:31; ER 280:12; USER 281/Buoy 288; USER 281/Sherry 267]. The plaintiffs nevertheless assert that summary judgment was inappropriate because a jury might infer that the Underwriters knew about the price cuts because Toolworks' management discussed the promotion while on a private plane with the Underwriters. All personnel who were on the plane, however, testified that no conversations regarding price cutting reached the Underwriters. As such, any inference that the Underwriters knew about the sales would not be based in fact and would be unreasonable. *See Weinberger,* ¶ 95,693 at 98,255. The district court properly granted summary judgment in favor of the Underwriters on this issue.

**b.**

■ The plaintiffs also claim that the prospectus was false and misleading because it stated that Toolworks "does not currently provide any product return rights to its retail Nintendo customers," when, in fact, the company had booked several consignment sales prior to the offering. Again, however, the plaintiffs offered no direct evidence that the Underwriters knew about the sales, which represented a significant departure from prior Toolworks' policy. In fact, the record illustrates that the Underwriters made a substantial effort to ascertain Toolworks' return policy, both before and after the consignment sales occurred. The plaintiffs nevertheless assert that circumstantial evidence permits an inference that the Underwriters knowingly "watered down" the prospectus' risk-disclosure statement about merchandise returns and ignored a memorandum from one Toolworks customer ("Walmart") describing an unlimited right-of-return. This argument, however, misconstrues the full record.

In the process of drafting the prospectus, the Underwriters did change the risk-disclosure statement. An original draft stated that, "[i]n light of increased competition among the [Nintendo] entertainment titles on the market, it may be necessary for [Toolworks] to modify its return policy." [ER 289/322:22]. The final version stated only that "[t]here can be no assurance that [Toolworks] will not be subject to product returns in the future." [ER 289/15:8]. This change, however, is not sufficient to permit a reasonable inference that the Underwriters knew or should have known that Toolworks actually had changed its return policy. In fact, the Underwriters changed the disclosure statement in direct response to assertions by Toolworks' management that the company would *never* offer return rights and that the prospectus as originally written could prompt customers to seek such concessions in the future. [ER 317/Cartmell:136].

Moreover, although the Underwriters did receive a memorandum from Walmart describing an unqualified right to return non-defective merchandise, [ER 289/11], the record illustrates that Walmart never actually had such rights. Upon receiving the Wal-mart memorandum, the Underwriters called the retailer and confirmed that the statement regarding returns was erroneous (it should have said that Walmart had an unqualified right to return *defective* merchandise). [*See* ER 317/Sherry:252; USER 334/Zuckerman:89]. Thus, in light of this correction, the fact that the actual contract between Toolworks and Walmart provided only for the return of defective items, and the fact that Walmart never returned any undamaged products, an inference that the Underwriters attempted to conceal Toolworks' return policy would be unreasonable. The district court properly granted summary judgment in favor of the Underwriters on this issue.

**2.**

The plaintiffs next assert that a material issue of fact exists regarding whether the Underwriters diligently investigated, or needed to investigate, Toolworks' recognition of OEM revenue on its financial statements. The plaintiffs claim that the Underwriters "blindly rel[ied]" on Deloitte in spite of numerous "red flags" indicating that the OEM entries were incorrect and that, as a result, the district court erred in granting summary judgment.

■ An underwriter need not conduct due diligence into the "expertised" parts of a prospectus, such as certified financial statements. Rather, the underwriter need only show that it "had no reasonable ground to believe, and did not believe ... that the statements therein were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(C); *see WOW II*, 35 F.3d at 1421. The issue on appeal, therefore, is whether the Underwriters' reliance on the expertised financial statements was reasonable as a matter of law.

**a.**

■ As the first "red flag," the plaintiffs point to Toolworks' "backdated" contract with Hyosung, a Korean manufacturer. During the fourth quarter of fiscal 1990, Toolworks recognized $1.7 million in revenue

from an OEM contract with Hyosung. In due diligence, the Underwriters discovered a memorandum from Hyosung to Toolworks stating that Hyosung had "backdated" the agreement to permit Toolworks to recognize revenue in fiscal 1990. [ER 283:11]. The plaintiffs claim that, after discovering this memorandum, the Underwriters could no longer rely on Deloitte because the accountants had approved revenue recognition for the transaction.

If the Underwriters had done nothing more, the plaintiffs' contention might be correct. The plaintiffs, however, ignore the significant steps taken by the Underwriters after discovery of the Hyosung memorandum to ensure the accuracy of Deloitte's revenue recognition. The Underwriters first confronted Deloitte, which explained that it was proper for Toolworks to book revenue in fiscal 1990 because the company had contracted with Hyosung in March, even though the firms did not document the agreement until April. [ER 283:12–13]. The Underwriters then insisted that Deloitte reconfirm, in writing, the Hyosung agreement and Toolworks' other OEM contracts. [ER 283:12–13]. Finally, the Underwriters contacted other accounting firms to verify Deloitte's OEM revenue accounting methods. [ER 278:13].

Thus, with regard to the Hyosung agreement, the Underwriters did not "blindly rely" on Deloitte. The district court correctly held that, as a matter of law, the Underwriters' "investigation of the OEM business was reasonable." *Toolworks I*, 789 F.Supp. at 1498.

### b.

The plaintiffs next assert that the Underwriters could not reasonably rely on Deloitte's financial statements because Toolworks' counsel, Riordan & McKinzie, refused to issue an opinion letter stating that the OEM agreements were binding contracts. This contention has no merit because, contrary to the plaintiffs' assertions, Toolworks had never requested the law firm to render such an opinion. [ER 317/Sylvester:36–42]. The plaintiffs attempt to infer wrongdoing in such circumstances is patently unreasonable. The district court correctly granted summary

judgment in favor of the Underwriters on this issue.

### c.

■ Finally, the plaintiffs assert that, by reading the agreements, the Underwriters should have realized that Toolworks had improperly recognized revenue. Specifically, the plaintiffs claim that several of the contracts were contingent and that it was facially apparent that Toolworks might not receive any revenue under them. As the Underwriters explain, this contention misconstrues the nature of a due diligence investigation:

[The Underwriters] reviewed the contracts to verify that there was a written agreement for each OEM contract mentioned in the Prospectus—not to analyze the propriety of revenue recognition, which was the responsibility of [Deloitte]. Given the complexity surrounding software licensing revenue recognition, it is absurd to suggest that, in perusing Toolworks' contracts, [the Underwriters] should have concluded that [Deloitte] w[as] wrong, particularly when the OEM's provided written confirmation.

We recently confirmed precisely this point in a case involving analogous facts: "[T]he defendants relied on Deloitte's *accounting decisions* (to recognize revenue) about the sales. Those expert decisions, which underlie the plaintiffs' attack on the financial statements, represent precisely the type of 'certified' information on which section 11 permits nonexperts to rely." *WOW II*, 35 F.3d at 1421; *see also In re Worlds of Wonder Sec. Litig.*, 814 F.Supp. 850, 864–65 (N.D.Cal.1993) ("It is absurd in these circumstances for Plaintiffs to suggest that the other defendants, who are not accountants, possibly could have known of any mistakes by Deloitte. Therefore, even if there are errors in the financial statements, no defendant except Deloitte can be liable under Section 11 on that basis.") [*WOW I*], *aff'd in relevant part by WOW II*, 35 F.3d at 1421.

Thus, because the Underwriters' reliance on Deloitte was reasonable under the circumstances, the district court correctly granted summary judgment on this issue. *See Toolworks I*, 789 F.Supp. at 1498 ("Given the

complexity of the accounting issues, the Underwriters were entitled to rely on Deloitte's expertise.").

### 3.

The plaintiffs next attack the Underwriters' due diligence efforts for the period after Toolworks filed a preliminary prospectus and before the effective date of the offering.[2] During this time, several significant events transpired. First, *Barron's* published a negative article about Toolworks that questioned the company's "aggressive accounting." [ER 289/22]. Second, in response to the *Barron's* article, the SEC initiated a review of Toolworks' prospectus. [ER 341/Weeks:32–33]. Third, Toolworks sent two letters responding to the SEC. And, fourth, Toolworks booked several consignment sales that made the company appear to have a prosperous quarter, thereby ensuring success of the offering.

The district court held that the Underwriters satisfied their due diligence obligations during this period primarily by relying on Toolworks' representations to the SEC. *Id.* at 1497–98. For the following reasons, we conclude that disputed issues of material fact exist regarding the Underwriters' efforts and, accordingly, we reverse and remand for a trial on the merits.

#### a.

 The plaintiffs first contend that the Underwriters should have done more to investigate the *Barron's* allegations of slumping sales and improper accounting. The Underwriters established, however, that they contacted a representative of Nintendo and several large retailers to confirm the strength of the market in response to the *Barron's* article. Moreover, as explained above, the Underwriters' reliance on Deloitte's accounting decisions was reasonable as a matter of law. Summary judgment was appropriate on this issue.

#### b.

 Next, the plaintiffs raise the issue of Toolworks' July 4, 1990 letter to the SEC, which described the company's June quarter performance. [ER 316/2006]. In the letter, Toolworks represented that, although preliminary financial data was not available, Toolworks anticipated revenue for the quarter between $21 and $22 million. The plaintiffs claim that Toolworks deliberately falsified these estimates and that the Underwriters knew of this deceit.

The Underwriters claim that they were not involved in drafting the July 4 SEC letter and that, as a result, they have no responsibility for its contents. The plaintiffs presented evidence, however, that the letter was a joint effort of all professionals working on the offering, including the Underwriters. In fact, a Riordan & McKinzie partner specifically testified that, "[w]hen the letter finally went to the SEC, all parties had been involved in the process of creating it. There had been conference calls discussing it and comments and changes made by a lot of different members of the working group." [ER 317/Weeks:40–41]. Others similarly testified that the Underwriters were actively involved in discussions of how to respond to the SEC's inquiries regarding the June quarter. [*See* ER 317/Barker:23–24; ER 317/Sylvester:18–19].

The Underwriters argue that, even if they participated in initial discussions about the letter, they never knew that Toolworks' financial data actually was available and that, as a result, they could not have known that the letter (and the prospectus) were misleading. Given the Underwriters participation in drafting both documents, however, we think this is an unresolved issue of material fact. A reasonable factfinder could infer that, as members of the drafting group, the Underwriters had access to all information that was available and deliberately chose to conceal the truth. We therefore hold that summary judgment was inappropriate on this issue.

---

**2.** The Underwriters' contention that the events of this period are inapplicable to sections 11 and 12(2) liability is clearly incorrect. Both statutory provisions require disclosure of information needed in order to make a prospectus truthful and not misleading. As the Underwriters' own experts testified, poor first quarter earnings prior to the effective date of the offering would definitely constitute material information and would have to be disclosed.

**c.**

After suffering lagging sales in the first two months of the June quarter, Toolworks booked several large consignment sales in late June, the quarter's final month, thereby enabling the company to meet its earning projections. [ER 289/300:MB10048–49; ER 289/33; ER 289/502; ER 289/505]. Toolworks later had to reverse more than $7 million of these sales in its final financial statements for the quarter. [ER 322:20–26]. The plaintiffs presented evidence that the Underwriters knew that Toolworks had performed poorly in April, that Toolworks had no orders for the month as of June 8, that the June quarter is traditionally the slowest of the year for Nintendo sales, and that the late June sales accounted for more revenue than the cumulative total of Toolworks' Nintendo sales for the prior two and a half months. For its due diligence investigation of these sales, however, the Underwriters did little more than rely on Toolworks' assurances that the transactions were legitimate. A reasonable inference from this evidence is that Toolworks fabricated the June sales to ensure that the offering would proceed and that the Underwriters knew, or should have known, of this fraud. As a result, we conclude that summary judgment regarding the Underwriters' diligence on this issue was also inappropriate. *See Feit v. Leasco Data Processing Equip. Corp.*, 332 F.Supp. 544, 582 (E.D.N.Y.1971) ("Tacit reliance on management is unacceptable; the underwriters must play devil's advocate.").

**C.**

Thus, we hold that the district court properly granted summary judgment in favor of the Underwriters on the section 11 and 12(2) issues regarding their due diligence investigation into Toolworks' Nintendo sales practices and description of OEM revenue. The district court erred, however, by granting summary judgment on the section 11 and 12(2) claims regarding the July 4 SEC letter and Toolworks' June quarter results. We remand for a trial on the merits of those claims.

**III.**

We next consider the plaintiffs' claims against the Underwriters and Deloitte under section 10(b) and Rule 10b–5 of the 1934 Act, which provide liability for deceptive conduct in connection with the sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To establish liability under section 10(b), the plaintiffs must show that the defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Hochfelder*, 425 U.S. at 193 n. 12, 96 S.Ct. at 1381. The plaintiffs may establish scienter by proving either actual knowledge or recklessness. *E.g., Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990) (en banc), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). In this context, "recklessness" is conduct "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 1569 (internal quotation omitted).

The district court granted summary judgment in favor of the Underwriters and Deloitte, holding that the defendants had not acted with scienter as a matter of law. *Toolworks I,* 789 F.Supp. at 1498–1510. Summary judgment on the scienter issue is appropriate only if "there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter." *Schneider v. Vennard (In re Apple Computer Sec. Litig.),* 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). We conclude that disputed issues of material fact exist and, as a result, we reverse and remand several of the claims under section 10(b).

**A.**

The plaintiffs raise the same issues against the Underwriters under section 10(b) as under sections 11 and 12(2). Because we conclude that the Underwriters acted with due diligence in investigating Toolworks' Nintendo business and OEM revenues, we

also hold that the Underwriters did not act with scienter regarding those claims. Therefore, the only section 10(b) issue involving the Underwriters is whether disputed issues of material fact exist regarding the July 4 SEC letter or the June quarter financial statements. We hold that they do.

■ The plaintiffs presented no evidence of the Underwriters' actual knowledge or fraudulent intent on these issues. As noted above, however, the evidence permits a reasonable inference that "the Underwriters had access to all information that was available and deliberately chose to conceal the truth" about figures in the July 4 SEC letter, *supra* page 2786, and that "the Underwriters knew, or should have known, of th[e] [alleged] fraud" in the June quarter statements, *supra* page 2786–87. This evidence is sufficient to defeat summary judgment on the scienter issue. We therefore remand for trial on these section 10(b) claims.

### B.

Regarding Deloitte, the plaintiffs allege that the accountants violated section 10(b) by improperly computing the financial statements included in Toolworks' prospectus, by assisting Toolworks in drafting misleading letters to the SEC, and by enabling Toolworks to issue false financial statements for the June quarter. We consider each contention in turn.

### 1.

Toolworks included in the prospectus financial statements for fiscal 1990, which had been certified by Deloitte. The plaintiffs allege that Deloitte violated section 10(b) by improperly describing Toolworks' OEM revenues and by failing to discover Toolworks' price reductions and return policies. We disagree.

### a.

In the district court, Deloitte conceded that the plaintiffs had raised a genuine issue of material fact as to whether the prospectus properly accounted for the OEM revenues. *Toolworks I*, 789 F.Supp. at 1504. Deloitte, however, contends that the plaintiffs presented no evidence that would support an inference of scienter with regard to this issue. The plaintiffs presented no direct evidence that Deloitte knew or recklessly disregarded errors in the financial statements. The plaintiffs did, however, produce circumstantial evidence with which they seek to infer that Deloitte acted with scienter. For example, the plaintiffs established that the OEM agreements were poorly documented, informal, and conditional [ER 297/Kumaria:439], that the OEM licensing transactions were risky [ER 296/851], that Toolworks' management was under "extraordinary pressure" for favorable earnings [ER 297/956], and that Deloitte obtained only oral confirmations of some agreements [ER 271:9] and deviated from their audit plan in reviewing the contracts [ER 295:27–28].

The district court found this evidence insufficient to support an inference of scienter. The court noted that Deloitte had reviewed the OEM documentation, obtained oral and written confirmation of the agreements from Toolworks' management, confirmed in writing most of the OEM agreements with outside vendors, obtained and reviewed Toolworks' licensing agreements, and reviewed the progress of Toolworks' collections on the OEM agreements. *Id.* at 1505. The court concluded that "[t]hese procedures provided Deloitte with ample support for the audit conclusions it reached.... Plaintiffs' contention ... that Deloitte should have performed further inquiries and investigations, arguing with the benefit of hindsight, does not establish that the [ ] audit was reckless." *Id.* We agree.

■ "[T]he proof of scienter in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1982). However, "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *WOW II*, 35 F.3d at 1426 (quotations omitted); *see, e.g., The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1045 (S.D.N.Y.1986) (errors in a client's financial statements do not give rise to an inference of fraud on the part of the auditor).

Rather, "[s]cienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *WOW II*, 35 F.3d at 1426 (quotations omitted).

■■■ In this case, the plaintiffs have not satisfied this standard. At most, the evidence establishes that Deloitte was negligent in auditing Toolworks, not that Deloitte recklessly or knowingly falsified the financial statements. The plaintiffs' expert, Albert Rossi, does not help their case. Although Rossi testified that Deloitte "knew that the OEM agreements did not meet Toolworks' or GAAP's requirements for revenue recognition," [ER 295:33–34], he provided no factual basis for these allegations of knowledge by Deloitte. As a result, his testimony merely "consists of self-righteous statements that, because Deloitte did not audit [Toolworks] as he would have done, Deloitte must have acted fraudulently. Such evidence is not sufficient." *Id.* at 1427; *see WOW I*, 814 F.Supp. at 871 n. 15 ("this is not the first time that a district court has awarded summary judgment to an auditor on the scienter issue in the face of a declaration by Rossi").

We therefore affirm the district court's summary judgment on the OEM revenue issue.

### b.

■■■ The plaintiffs also claim that Deloitte should have included in the 1990 financial statements a description of Toolworks' return and price protection policies. Deloitte correctly notes, however, that Toolworks did not grant return rights or price guarantees until fiscal 1991, after the 1990 audit was complete. The plaintiffs presented no evidence that Deloitte knew, or should have known, that Toolworks would change its policies. In fact, Toolworks acquired the Nintendo business only at the very end of fiscal 1990. [ER 296/15:F–9]. The failure of Deloitte to include statements about Toolworks' not-yet-implemented return and pricing policies does not give rise to a reasonable inference of scienter. *See Laven,* 695 F.Supp. at 812 ("summary judgment can be granted if plaintiff fails to present credible evidence of *scienter* "). The district court's summary judgment in favor of Deloitte on this issue was therefore appropriate.

### 2.

The plaintiffs next contend that Deloitte violated section 10(b) by participating in drafting the two letters that Toolworks sent to the SEC.[3] As noted above, the plaintiffs allege that the letters falsely stated that Toolworks did not have preliminary financial data available for the June quarter and misleadingly described the nature of Toolworks' OEM contracts.

### a.

■■■ On July 3, 1990, the SEC told Toolworks that it should disclose "preliminary results" for the June quarter in the prospectus. [ER 316/35]. In its July 4 response, Toolworks stated that "[p]reliminary financial data is not now available," but that the company "anticipated" revenues for the quarter to range between $21 and $22 million.

---

**3.** The district court analyzed this issue in terms whether Deloitte was liable for "aiding and abetting" Toolworks' primary violation of section 10(b). *See Toolworks I,* 789 F.Supp. at 1507–09. After the district court issued its opinion, however, the Supreme Court concluded that aiding and abetting liability does not exist under section 10(b). *See Central Bank v. First Interstate Bank,* — U.S. —, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Despite *Central Bank,* we nevertheless consider this issue because the plaintiffs' complaint clearly alleges that Deloitte is primarily liable under section 10(b) for the SEC letters. In fact, the July 1 SEC letter stated that it "was prepared after extensive review and discussions with ... Deloitte" and actually referred the SEC to two Deloitte partners for further information. [ER 296:234]. Similarly, the plaintiffs presented evidence that Deloitte played a significant role in drafting and editing the July 4 SEC letter. [ER 317/Weeks:40–41]. This evidence is sufficient to sustain a primary cause of action under section 10(b) and, as a result, *Central Bank* does not absolve Deloitte on these issues.

[ER 316/2006]. Toolworks, however, had acknowledged to the professionals participating in the offering that some financial data for the quarter actually was available. [ER 317/Weeks:77–82]. The plaintiffs allege that, as a result, the statement to the SEC was a deliberate falsehood and that Deloitte violated section 10(b) by suggesting in the July 4 SEC letter that preliminary data was not available and by acquiescing to financial projections which they knew, or should have known, to be false. We agree for the same reasons that we have reversed the summary judgment in favor of the Underwriters on this issue. Specifically, we conclude that "[a] reasonable factfinder could infer that, as members of the drafting group, [Deloitte] had access to all information that was available and deliberately chose to conceal the truth" about Toolworks' poor June quarter performance, *supra* page 2786. Summary judgment was inappropriate on this issue.

### b.

█ In its July 1 letter to the SEC, Toolworks attached a "model" OEM agreement for the SEC to review. [ER 296/234]. The plaintiffs claim that the letter was false and misleading because the model agreement differed from the agreements that Toolworks actually used. We agree.

The model OEM agreement stated that "in no event shall the OEM be relieved from any minimum payment obligations." [ER 296/234]. Only four of Toolworks's actual OEM contracts, however, contained such language. Because only a small portion of the total OEM contracts included the "model" language, Deloitte should have known that the model agreement was false and misleading, and inclusion of the model agreement in the July 1 SEC letter gives rise to a reasonable inference that Deloitte knew or recklessly disregarded this falsehood. Deloitte claims that it did not draft, or even see, the model agreement and cannot therefore be liable for it. Deloitte, however, ignores the fact that the misleading language of the model agreement was actually quoted in the body of the July 1 SEC letter itself, which Deloitte admittedly saw. [ER 296/234:6]. We hold

that summary judgment was therefore inappropriate as to this issue.

### 3.

█ Finally, the plaintiffs allege that Deloitte violated section 10(b) by enabling Toolworks to issue preliminary financial statements for the June quarter. *See Toolworks I*, 789 F.Supp. at 1506–07. The plaintiffs admit, however, that "[a]s to the[se] quarterly financial statements, the Complaint [only] charged Deloitte with aiding and abetting" Toolworks' primary violation of section 10(b). As a result, under *Central Bank* the plaintiffs' claims are no longer viable. *Central Bank*, —— U.S. at ——, 114 S.Ct. at 1455 ("a private plaintiff may not maintain an aiding and abetting suit under § 10(b)"). We therefore affirm the district court's summary judgment in favor of Deloitte on this issue.

### C.

In summary, we conclude that, although the district court properly granted summary judgment in favor of the Underwriters and Deloitte on most of the section 10(b) claims, summary judgment was inappropriate on the issues regarding the SEC letters and Toolworks' June quarter results. We remand those claims.

### IV.

The district court properly granted summary judgment in favor of the Underwriters on the section 11 and 12(2) claims regarding Toolworks' Nintendo sales and OEM accounting. The court erred, however, by ignoring disputed issues of material fact regarding the Underwriters' due diligence investigation of Toolworks' financial performance in the June quarter and the description of that performance in the July 4 SEC letter. Summary judgment was inappropriate on those issues.

Furthermore, the district court properly granted summary judgment in favor of the Underwriters on all the section 10(b) claims other than those arising from the July 4 SEC letter and the June quarter statements. The court also properly granted summary judgment in favor of Deloitte on the section 10(b)

claims regarding recognition of OEM revenues in the audited financial statements appended to the prospectus. The district court erred, however, in granting summary judgment in favor of Deloitte on the section 10(b) claims regarding the SEC letters and Toolworks' unaudited financial statements for the June quarter.

We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

**AFFIRMED in part. REVERSED in part. REMANDED.**