**Stanley PELTZ; Richard G. Ryan, On Behalf of Themselves and All Others Similarly Situated, Plaintiffs—Appellants,**

v.

**POLYPHASE CORPORATION; Paul A. Tanner; Ply Stadium Partners, Inc.; Pyrenees Group; James Rudis; William E. Shatley; Michael F. Buck; George R. Schrader, Defendants—Appellees.**

No. 01–15732.

D.C. No. CV–97–00791–RLH(RJJ).

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 2002.

Decided June 5, 2002.

Before WALLACE, KOZINSKI, and PAEZ, Circuit Judges.

## MEMORANDUM *

Plaintiffs in this purported class action appeal from the district court's summary judgment in favor of the defendants. The district court had jurisdiction under 15 U.S.C. § 78aa, 28 U.S.C. § 1331 and 28 U.S.C. § 1367. We have jurisdiction over this timely appeal by 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand.

"We conduct [a] *de novo* review of the district court's ... summary judgment. In so doing, we are mindful that, although

materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact, summary judgment may be granted in appropriate cases." *Software Toolworks Inc. Sec. Litig. v. PaineWebber Inc.*, 50 F.3d 615, 620 (9th Cir.1994).

### I.

Plaintiffs advance two theories of liability under Rule 10b–5: 1) that Polyphase made material misstatements and 2) that individuals connected with Polyphase engaged in insider trading. 17 C.F.R. § 240.10b–5.

### A.

We first confirm that Polyphase may be liable under the fraudulent misstatement theory whether or not it bought or sold securities during the time period in question. All that is required is for a misstatement to be made "in connection with" a securities transaction. *Id.* For our purposes, it is enough that the alleged misstatements "[were] made, as here, in a manner reasonably calculated to influence the investing public...." *McGann v. Ernst & Young*, 102 F.3d 390, 393 (9th Cir.1996).

### 1.

The first set of alleged misstatements relate to Polyphase's failure both to disclose the Overhill debt problem and to account for the Overhill loan as a current liability. The alleged misstatements include Polyphase's quarterly Form 10Q statements filed on May 20 and August 19, 1996, its December 27, 1996 Form 12B–25 Notice of Late Filing, its January 27, 1997 press release, and its February 3, 1997 suspension of trading announcement. These alleged misstatements were material "if there [was] a substantial likelihood that a reasonable shareholder would con-

sider it important in deciding" whether or not to buy, sell, or hold. *See TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

Plaintiffs' main argument is that Polyphase's financial disclosures misstated the truth in a material way because they violated Generally Accepted Accounting Principles (GAAP). Plaintiffs suggest that Polyphase should have classified the Overhill loan as a current liability when it became callable or, in other words, the moment that Overhill *could* have declared an event of default. Polyphase contends that it was not required to account for the Overhill loan as a current liability until an event of default had been declared and no possibility of reconciling with the creditor remained. Plaintiffs' argument is supported by the affidavit of accounting expert, Wanda L. Lorenz. Polyphase disagrees because its accountants "did not conclude that there had been upstreaming in breach of any loan covenants until after Rice's declaration of an Event of Default." That the Polyphase accountants did not determine that a breach had occurred prior to Rice's declaration does not mean that it did not occur or that GAAP did not require the loan to be classified as a current liability when it was callable. Thus, Ms. Lorenz's testimony is undisputed.

■ Whether a GAAP violation makes a financial disclosure misleading per se is an open question in our Circuit. We have no need to decide this question here because Polyphase's failure to disclose the Overhill loan problem raises a genuine issue of fact as to whether the financial disclosures were materially misleading regardless of GAAP. This was not a minor breach. With certain narrowly circumscribed exceptions, the loan agreements limited the amount that Polyphase could take from Overhill to $250,000. Polyphase appears

to have exceeded that amount by over four million dollars. This information was clearly material. Polyphase's share price fell from $7 to $1 5/8 when it was finally disclosed. Further, Polyphase's funneling of money from Overhill became a material fact that should have been disclosed along with Polyphase's other disclosures at least as soon as there was a serious risk that the Overhill loan would be called. This risk was present by the time Polyphase had transferred more than twice the transfer limit. According to a class exhibit, this happened by December 31, 1995 at the latest. Plaintiffs raised a triable issue with respect to whether Polyphase's financial disclosures were materially misleading.

The more difficult question is whether Plaintiffs have raised a triable issue with respect to scienter. To establish scienter for Rule 10b–5 purposes, plaintiffs must show that Polyphase engaged in intentional, knowing, or reckless misconduct. *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir.1978), *Silicon Graphics Inc. Sec. Litig. v. McCracken*, 183 F.3d 970, 975–76 (9th Cir.1999). Much has been said by both parties about the role of motive and "red flags" in the scienter determination. We consider motive and "red flags" as circumstantial evidence of scienter. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir.2000). Circumstantial evidence is sufficient to establish a triable issue of fact but is unnecessary when, as here, there are many instances of direct evidence. The question we first ask is whether the defendants knew, in light of the Overhill loan problem, that there was a significant likelihood that the Polyphase financial statements would have to be re-stated.

The following table shows the dates the alleged misstatements were made:

| Alleged Misstatement | Date |
|---|---|
| 1996 second quarter 10–Q (fiscal quarter) | May 20, 1996 |
| 1996 third quarter 10–Q | August 19, 1996 |
| 12B–25 Notice of Late Filing | December 27, 1996 |
| Financial information press release | January 27, 1997 |
| Announcement of suspension of trading on AMEX | February 3, 1997 |

#### a. Polyphase Corporation

A corporation's mental state is established through the mental state of its officers and directors. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir.1995). Whether Polyphase Corporation had the requisite scienter depends on the mental states of Tanner, Rudis, Buck, and Schrader.

#### b. Tanner and Rudis

Rice sent the default letter to Tanner on October 30, 1996. Rudis was aware of the letter when it was received by Tanner. Despite the default notice, Polyphase stated in its December Notice of Late Filing that it did not expect "any significant change in results of operations." And Polyphase reported summary financial results in its January 27 and February 3 statements without any indication that Rice had called the Overhill loan. Tanner and Rudis knew that the default problem put Polyphase's financial status in jeopardy yet they made no mention of this serious risk in their formal and informal public financial disclosures. Plaintiffs have raised a triable issue with respect to whether Tanner and Rudis (and thus Polyphase) had the requisite scienter for the post-October 30 statements.

We now turn to the Form 10Qs. The third quarter 10Q was filed on August 19, 1996. Tanner and Rudis attended a meeting with Wilson, the Rice representative, in July of 1996. While Tanner's memory of this meeting is murky, Rudis and Wilson both recall that Wilson asked Polyphase to stop transferring funds from Overhill to Polyphase because the transfers violated the loan covenants. Further, Wil-

son stated that at the July meeting he demanded that Polyphase return the funds it had transferred from Overhill in excess of those permitted under the loan covenants. Although the defendants dispute this version of the facts, drawing all inferences in favor of the non-moving party, we must credit Wilson's account. Tanner testified that the transferred money was spent on the stadium project and that Overhill's ability to repay the loan depended on the success of the stadium project.

Thus, "viewing the evidence in the light most favorable to" the plaintiffs, Polyphase would have been left in a precarious position if Rice had declared a default. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000). For summary judgment purposes, we conclude that Tanner and Rudis knew at least by August 1996 that Rice's demand presented Polyphase with serious financial problems. Plaintiffs, therefore, have raised a triable issue with respect to Tanner and Rudis' (and Polyphase's) scienter as it relates to the August 19 Form 10Q.

The May 20 Form 10Q is a different story. No direct evidence suggests that Tanner and Rudis knew for a fact that the Polyphase financial statements, in light of the dispute with Rice, were misleading. Indeed, there are no facts showing the conflict with Rice arose until the July meeting. We, therefore, ask whether Tanner and Rudis had a motive to misstate the truth and whether certain "red flags" were present such as "potentially alarming information concerning [Polyphase's] financial condition." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir.2000). No evidence has been pointed out to us of a "potentially alarming" red flag prior to the July 1996 meeting. Consequently, plaintiffs have failed to raise a triable issue with respect to Tanner, Rudis, and Polyphase's scienter as it pertains to the May

20 10Q. The district court's summary judgment on this point is affirmed.

### c. Buck and Schrader

For outside directors Buck and Schrader to be held liable for the Polyphase misstatements, plaintiffs must show that Buck and Schrader "either participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." *See Glenfed, Inc. v. Glenfed, Inc.*, 60 F.3d 591, 593 (9th Cir.1995) (citations omitted). Plaintiffs have pointed to no evidence in the record which shows either that Buck or Schrader was involved in Polyphase to the requisite degree. Indeed, Buck and Schrader's affidavits suggest that they were not. Plaintiffs have failed to raise a triable issue with respect to Buck and Schrader's liability for the alleged Polyphase misstatements. The district court is affirmed on this issue.

### d. Pyrenees Group (Pyrenees)

Pyrenees did not make any of the alleged misstatements nor was it an officer or director of Polyphase. Summary judgment in favor of Pyrenees on the Rule 10b–5 corporate misstatement theory was appropriate.

### e. PLY Stadium Partners, Inc. (PLY)

PLY did not make any of the alleged misstatements nor was it an officer or director of Polyphase. Summary judgment in favor of PLY on the Rule 10b–5 corporate misstatement theory was appropriate.

### 2.

█ The second set of alleged misstatements relates to Polyphase's dealings with PLY. In its 1996 second and third quarter 10Qs, Polyphase accounted for the PLY

management fees as revenues even though it had not yet collected them. Polyphase may also have violated GAAP by accounting for the PLY loans as current assets without taking a reserve. In both 10Qs, however, Polyphase disclosed that its ability to collect the PLY management fees and loans was contingent either upon the success of the stadium project or upon the strength of Tanner and Pyrenees' guarantee of the loans. Because Polyphase disclosed the collection risk in the 10Qs, there was no material misstatement. The district court's summary judgment on this point is affirmed.

### B.

We now turn to the alleged insider trading. To have standing to bring an insider trading claim, a plaintiff must have "traded contemporaneously with the insider." *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir.1993).

■ While plaintiffs have pointed to evidence that other members of the purported class traded contemporaneously, they have failed to demonstrate that they traded contemporaneously. Plaintiffs therefore lack standing to bring their insider trading claims. Our decision here should in no way be interpreted to preclude the class from relying on evidence of "[i]nsider trading in suspicious amounts or at suspicious times" as circumstantial evidence of Polyphase's corporate misstatement scienter. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117–18 (9th Cir.1989).

### II.

Plaintiffs also argue that the Polyphase officers and directors are liable as control persons under section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). A person or entity is jointly and severally liable for another's primary violation of Rule 10b–5 if he has "the *power* to control or influence [the primary violator]" and if the control-

ling person was a *"culpable participant[ ]* in the [primary violation]." *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987).

Tanner and Rudis, as principal officers, satisfy both criteria. The district court's summary judgment is reversed inasmuch as it pertains to their liability as control persons.

■ For directors Buck and Schrader to be liable as control persons, they must have participated in Polyphase's operations or exerted "some influence" therein. *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir.1984). We held in *Burgess* that two outside directors were not control persons because their day-to-day involvement in the business of the primary violator was minimal and because they did not participate in the alleged fraud. In this case, there is no evidence that either Buck or Schrader were active participants in Polyphase's day-to-day activities. There is some evidence, however, that they were aware of and participated in the decision to file the 12B–25 late filing notice. Consequently, plaintiffs have raised a triable issue with respect to Buck and Schrader's liability as control persons, and we reverse on that issue.

■ The only evidence pertaining to Pyrenees' control over Polyphase shows that Pyrenees owned less than fourteen per cent of Polyphase. Because this is not enough to demonstrate that Pyrenees had the ability to control Polyphase, the district court's summary judgment on this issue is affirmed.

Because PLY has never had an ownership interest in Polyphase, it cannot be liable as a control person. The district court's summary judgment in PLY's favor on this point is affirmed.

### III.

Polyphase argues that summary judgment in favor of PLY and Pyrenees was

proper because PLY and Pyrenees were not added as defendants until after the one-year limitations period expired. Because we have affirmed the district court's summary judgment in favor of PLY and Pyrenees on all counts already, we need not reach this issue.

Plaintiffs also raised state common law fraud and negligent misrepresentation claims. On remand, the district court is directed to consider those claims to the extent warranted by this decision.

Finally, we decline to grant Polyphase's request for additional discovery because it failed to bring a motion to compel discovery in district court. *See Byrd v. Guess,* 137 F.3d 1126, 1135 (9th Cir.1998).
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

* This panel unanimously finds this case suitable for decision without oral argument. See Fed. R.App. P. 34(a)(2).

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.