**In re HOMESTORE.COM, INC. SECURITIES LITIGATION.**

**No. C01–11115 MJP (CWX).**

United States District Court, C.D. California.

May 11, 2004.

Bruce L. Simon, Joseph W. Cotchett, Peter E. Borkon, Robert G. Retana, Mark Cotton Molumphy, Nanci E. Nishimura, Steven N. Williams, Cotchett Pitre Simon & McCarthy, Burlingame, CA, Clifford H. Pearson, Gary S. Soter, Wasserman Comden Casselman & Pearson, Tarzana, CA, Darren J. Robbins, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA, Jeffrey H. Dasteel, Katherine M. Pratt, Skadden Arps Slate Meagher & Flom, Los Angeles, CA, Tracey L. Worthington, Bernstein, Litowitz, Berger & Grossmann, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for Plaintiffs.

Robert C. Vanderet, Seth A. Aronson, Sharon Louise Tomkins, O'Melveny & Myers, Howard M. Privette, Morgan J. Miller, Paul Hastings Janofsky & Walker, Los Angeles, CA, Michael J. Biles, Paul R. Bessette, Brobeck, Phleger & Harrison, Austin, TX, Donna M. Herzing, Robert Charles Friese, Zesara Chan, Shartsis, Friese & Ginsburg, San Francisco, CA, Marc A. Fenster, Russ, August & Kabat, Richard D. Gluck, Fairbank & Vincent, Robert H. Fairbank, Los Angeles, CA, John William Davis, John W. Davis Law Offices, San Francisco, CA, Daniel S. Floyd, Dean J. Kitchens, Lynn M. Dean, Mark Mermelstein, Richard J. Doren, Sogol K. Pirnazar, Ted Allan Gehring, Wendy L. Wallace, Gibson, Dunn & Crutcher, C. Robert Boldt, Erin Nicole Brady, Kirkland & Ellis, Jan L. Handzlik, Howrey, Simon, Arnold and White, John B. Quinn, Thad Alan Davis, Quinn, Emanuel, Urquhart, Oliver & Hedges, Los Angeles, CA, Ana C. Reyes, F. Whitten Peters, George Borden, Ryan T. Scarborough, Williams & Connolly, Washington, DC, Samuel Kader, Stephen P. Warren, Skadden, Arps, Slate, Meagher & Flom, New York, NY, Stuart A. Shanus, Reed, Smith, Crosby & Heafey, Los Angeles, CA, Pamela J. Naughton, Sheppard, Mullin, Richter & Hampton, San Diego, CA, Alison T. Shaw, Thomas O. Helton, Baker, Donelson, Bearman & Caldwell, Chattanooga, TN, William D. Naeve, Cotkin, Collins & Ginsburg, Santa Ana, CA, Pallavi Wahi, Phillip H. Ginsberg, Stokes Lawrence, Seattle, WA, Richard R. Mainland, Fulbright & Jaworski, Los Angeles, CA, Douglas J. Clark, Kent Wycliffe Easter, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Charles L. Zetterberg, Buxbaum & Chakmak, Claremont, CA, J. Thomas Richardson, Maureen D. Burke, Whitney H. Leibow, Cairncross & Hempelmann, Seattle, WA, Eric William Benisek, Richard C. Vasquez, Tatia M. Lira, Morgan, Miller & Blair, Walnut Creek, CA, William K. Mills, Parker, Mills & Patel, Los Angeles, CA, Bernard C. Barmann, Jr, Ralph F. Hirschmann Law Offices, Los Angeles, CA, Marc J. Ross, Richard J. Babnick, Jr., Sichenzia, Ross, Friedman, Ference, New York, NY, Mary T. Huser, Bingham McCutchen, East Palo Alto, CA, Torgny R. Nilsson, Thelen, Reid & Priest, Los Angeles, CA, Krista J. Martinelli, Walter Jesse Robinson, III, Pillsbury Winthrop, Palo Alto, CA, David W. Shapiro, Boies, Schiller & Flexner, Oakland, CA, Tanya Chutkan, William A. Isaacson, Boies, Schiller & Flexner, Washington, DC, Kathleen T. Dyer, Nanci L. Clarence, Clarence, Snell & Dyer, San Francisco, CA, David Colburn, O'Neill & Sun, Santa Monica, CA, Carl S. Kravitz, Graeme W. Bush, Kristen Flynn, Roger C. Spaeder, Zuckerman Spaeder, Washington, DC, Jodi M. Newberry, Paul D. Murphy, Murphy, Rosen and Cohen, Santa Monica, CA, Yolanda Orozco, Liner, Yankelevitz, Sunshine and Regenstreff, Los Angeles, CA,

Belinda S. Lee, Latham & Watkins, Los Angeles, CA, Everett C. Johnson, Jr, Latham & Watkins, Washington, DC, J. Christian Word, Latham & Watkins, Reston, VA, Edward S. Nathan, Herbert J. Stern, Jeffrey, Speiser, Stern & Greenberg, Roseland, NJ, for Defendants.

Nicholas Koluncich III, Nicholas Koluncich III Law Offices, Albuquerque, NM, Laurie A. Traktman, Gilbert & Sackman, Los Angeles, CA, for Movant.

Michael R Wilner, AUSA—Office of US Attorney Criminal Div—US Courthouse, Los Angeles, CA, for Intervenor.

Peter B. Tafeen, Kirkland, FL, Pro Se.

Steven F. Helfand, San Francisco, CA, Pro Se.

## ORDER ON DEFENDANT PRICEWATERHOUSE COOPERS' MOTIONS FOR SUMMARY JUDGMENT

PECHMAN, District Judge.

This matter comes before the Court on Defendant PricewaterhouseCoopers, LLP's ("PwC") motions for summary judgment (Dkt. Nos.343, 344, 345). Lead Plaintiff California State Teachers' Retirement System ("CalSTRS") originally brought this private securities action alleging various acts of fraud on the part of several of Defendant Homestore.com, Inc.'s ("Homestore") officers and executives. CalSTRS later filed a First Amended Consolidated Complaint naming PwC and several third party corporations, alleging various degrees of participation in the fraudulent actions of Homestore. The Court certified a class of persons who purchased Homestore stock from January 1, 2000 through December 21, 2001. PwC now brings three motions for summary judgment. The first two motions address allegations by the Plaintiffs that PwC was a primary violator of Section 10(b) of the Securities Exchange Act and Rule 10b–5

promulgated thereunder, both on the issue of scienter and on what specific acts can be considered primary violations of the Act and Rule. PwC also brings a motion for summary judgment as to Plaintiffs' claim that PwC was a "control person" within the meaning of Section 20(a) of the Securities Exchange Act.

Having considered the pleadings and voluminous exhibits submitted by the parties, and having heard oral argument on the issues, the Court hereby DENIES PwC's motion on primary violations, DENIES PwC's motion relating to scienter, and GRANTS PwC's motion on control person liability.

## BACKGROUND

Lead plaintiff CalSTRS, a pension fund for California teachers, brought this class action for damages arising from its purchase of large quantities of Homestore common stock. Plaintiff originally brought this suit against Homestore.com, Inc., several of its officers, and several outside business partners and third party vendors. Plaintiff alleged in its complaint that several Homestore insiders, with the knowledge of Homestore's auditor PricewaterhouseCoopers and the active participation of various outside business entities, unlawfully "created revenue" through various types of dubious transactions in order to prop up Homestore's stock price. Plaintiff claimed that these transactions, combined with improper accounting and the release of written and oral public statements made to the Securities Exchange Commission, analysts, and the general public, perpetrated a fraud on Homestore's shareholders and the investing public in violation of federal securities statutes and regulations promulgated thereunder. Eventually, Homestore was forced to restate seven quarters of revenue because of the improper transactions and accounting.

By this action, Lead Plaintiff and the resulting certified class seek to recover damages incurred when the market price of Homestore common stock fell once the need for restatement became public.

More specifically, Plaintiff alleged in its complaint that management at Homestore, including Defendants Peter Tafeen, former Executive Vice President of Business Development and Sales, and Stuart Wolff, former CEO and Chairman, were driven to achieve certain "revenue targets" that were set by analysts and, more generally, Wall Street. Examining a company's revenues had become a means of measuring the value of, or predicting the potential future success of, many start-up companies that were not yet profitable. Plaintiff alleged that Homestore's management became preoccupied, if not obsessed, with meeting or exceeding revenue goals. If those goals could not be legitimately achieved, Plaintiff alleged, management engaged in three different but related types of transactions with third party entities, all of which "created revenue" for Homestore through various ways that the transactions were constructed and "booked." These are "barter transactions," "buying revenues" or "revenue purchasing," and "triangular transactions." Plaintiff alleged that many of these transactions at first occurred with the knowledge and approval of the auditor PwC, but that as time progressed, the revenue transactions became more and more complex in order to keep the accounting of the transactions from being questioned by PwC.

"Barter transactions" are two-party, reciprocal ("back-and-forth") transactions. At various times, but in particular early in the class period, Plaintiff alleges that Homestore and other companies agreed to trade services, generally advertising on the Homestore.com web site in exchange for some amorphous service such as "web services" or "marketing solutions." This would be a true barter transaction. However, instead of just trading those services, the two companies agreed to buy each other's services for an extremely exaggerated rate. For example, Homestore would pay $5 million for marketing solutions, and the other company would pay $5 million for Homestore advertising. Homestore would then realize the $5 million in revenue. In accounting for these transactions, Homestore was supposed to provide actual market value of the services, "net out" the cost of the reciprocal transaction (making the net revenue zero), and/or report the two transactions as linked. Plaintiffs allege that Homestore, with the assistance and guidance of PwC, often attempted to dissociate a pair of transactions temporally and legally by intentionally booking the transactions in two different quarters, thereby recognizing the revenue from the "sale" of its advertising.

"Buying revenues" are two-party transactions as well, and are very similar to the barter transactions. In this instance, the difference is that Homestore traded stock "warrants" (a form of stock option) for some service, and in a contemporaneous agreement received cash for some other service like advertising. The true transaction was the cash for the warrants, known as a "stock-for-revenue" transaction, which must be reported as such in accounting for the transactions.

"Triangular transactions," or "round-tripping" transactions, were slightly more complex transactions involving three parties that were completed later in the class period and were largely hidden from Homestore's auditor Pricewaterhouse-Coopers. By way of example, America OnLine ("AOL") and Homestore entered into a "revenue sharing agreement" or "advertising reseller agreement" in which

AOL agreed to sell advertising for Homestore for a commission. This commission was far above market value. This agreement may have been valid on its own, but set the stage for allegedly improper transactions. Homestore would find some third party corporation, one that was thinly capitalized and in search of revenues in order to "go public." Homestore then agreed to purchase shares in that company for inflated values or to purchase services or products that Homestore did not need. This transaction was contingent on the third party company "agreeing" in a "hidden leg" to buy advertising from AOL for most or all of what Homestore was paying them. The money thus flowed through the third party to AOL, which then took a commission and shared "revenue" with Homestore. This is an exceptionally expensive way to create revenue due to the cuts taken in each step along the way. This practice depleted the cash reserves of Homestore, but created "revenue" in order to meet the revenue targets, allegedly helping to prop up the stock price.

Several of the above-described transactions occurred during the class period, and they became more complex as time passed. For purposes of this motion, the parties have focused primarily on the barter-type and revenue purchasing transactions. The improper and/or fraudulent nature of those transactions finally became apparent in late 2001, when extremely suspect circumstances surrounding a transaction with a company called L90 came to light. Homestore's Audit Committee found the situation sufficiently alarming that a general investigation under Section 10A of the Securities Exchange Act was commenced. The Audit Committee retained counsel and a forensic accounting firm, who conducted the investigation into issues of potential fraud and financial statement misrepresentation. PwC then reviewed Homestore's financial statements and determined that revenues recognized on a number of transactions between the second quarter of 2000 and the third quarter of 2001 had to be restated in order to be consistent with the Generally Accepted Accounting Practices ("GAAP"). The total amount restated for revenues during the class period was approximately $160 million. The Securities Exchange Commission and the United States Attorney's Office have been conducting investigations into these matters since that time, and have produced several plea agreements, including the payment of substantial monetary penalties.

By prior order resolving thirteen motions to dismiss, the Court held as a matter of law that the outside Defendants, with the exception of PwC, could not be held liable under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 10b–5 in accordance with the Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), which eliminated "aiding and abetting" liability in private securities fraud actions. Some of the inside Defendants were also dismissed from the case without prejudice for Plaintiff's failure to sufficiently plead allegations of fraud against them under the analysis of the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u, as interpreted by the Ninth Circuit in *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 977 (9th Cir.1999). In contrast, the Court held that plaintiff had sufficiently pled facts stating a cause of action as to Homestore's auditor PricewaterhouseCoopers and Homestore's former CEO and Chairman Stuart Wolff. Former Executive Vice President of Business Development and Sales Peter Taffeen and the corporate entity Homestore.com, Inc. answered the complaint without filing motions to dismiss, and the case then pro-

ceeded as to those remaining four defendants.

A shareholder class was later certified as follows:

All persons or entities (excluding defendants, any members of their immediate families, any person, firm, trust, corporation, present or former officer, director, or other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants, and any legal representatives, agents affiliates, heirs, successors-in-interest or assigns of any excluded party), who purchased Homestore.com, Inc. stock from January 1, 2000 through December 21, 2001.

(Order Granting Renewed Motion for Class Certification, Dkt. No. 279). Discovery then proceeded, a task involving dozens of depositions and the production of tens of thousands of documents. Meanwhile, the Plaintiff Class arrived at a settlement with the extant corporate entity Homestore.com, Inc. This Court recently approved this settlement pursuant to Federal Rule of Civil Procedure 23(e).

PricewaterhouseCoopers now brings three motions for summary judgment. Plaintiffs allege generally that PwC was a valued business advisor, heavily involved in the day-to-day business of the company, and that PwC helped Homestore create and realize revenues by its review and approval of several improper transactions. Specifically, Plaintiffs allege that early in the class period, PwC knew of the barter or "back-and-forth" nature of several of Homestore's transactions, questioned some transactions but not others, and allowed some such transactions to be booked separately even knowing of their linked nature. In conjunction with the actual transactions, PwC then reviewed and approved (or at least did not object to) the dissemination of information regarding the transactions via press releases and inclusion in the company's quarterly reports to the SEC. Plaintiffs argue that this level of participation constitutes primary violations of the securities laws.

PwC contends that its unqualified audit certification for the Fiscal Year Ending 2000, issued on April 2, 2001, is the only potential primary violation, while all other interactions with Homestore and its finances and accounting amount at most to "aiding and abetting" liability, which has been eliminated in private securities actions by *Central Bank*. PwC also argues that Plaintiffs cannot demonstrate that PwC acted with the requisite scienter, defined as "deliberate recklessness," when it acted as Homestore's independent outside auditor. Finally, PwC argues in its third motion that Plaintiffs cannot establish that PwC exercised the requisite level of power and control that would incur "control person" liability under Section 20(a).

## ANALYSIS

### A. *Liability under Section 10(b) and Rule 10b–5*

Congress enacted the Securities Exchange Act of 1934 to regulate various practices of trading in securities in an effort to correct many of the abuses that led to the stock market crash of 1929. Plaintiffs in this case have brought causes of action under Sections 10(b) and 20(a) of the Act, as well as under the Security and Exchange Commission's ("SEC") Rule 10b–5. Section 10(b) of the Act states in relevant part:

It shall be unlawful for any person, directly or indirectly ... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may proscribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 implements this statute, stating:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ In order to establish a claim under Section 10(b) and Rule 10b–5, Plaintiffs must establish that PwC (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) on which the Plaintiffs justifiably relied, (5) that proximately caused injury to Plaintiffs via their investment in Homestore. *Ambassador Hotel Co. v. Wei–Chuan Investment,* 189 F.3d 1017, 1025 (9th Cir.1999).

■ By its motions, PwC attacks Plaintiffs' claims on two grounds. First, PwC argues that only its audit certification of Homestore's Fiscal Year Ending ("FYE") 2000 financial statements is an appropriate "statement" that could potentially result in liability. (PwC Mot. #2 for Summ. J.).

Second, PwC argues that Plaintiffs' cannot demonstrate that PwC acted with the requisite scienter in issuing its audit, or any other statement alleged to be attributable to it. (PwC Mot. #1 for Summ. J.). The Court analyzes these motions in turn.

### 1. *Central Bank and Primary Liability for Auditors*

■ The Supreme Court has held that Section 10(b) and Rule 10b–5 do not provide for liability for aiders and abettors of securities violators. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In other words, a person can only be held privately liable under the Securities Acts if one is a "primary violator" of Section 10(b) and/or Rule 10b–5. However, the Court noted that:

The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, *including a lawyer, accountant, or bank,* who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators ...

*Id.,* 511 U.S. at 191, 114 S.Ct. 1439 (emphasis added).

The first question to be resolved, therefore, is how does *Central Bank* apply to an auditor secondary actor. In other words, what makes an auditor a "primary violator"? Plaintiffs cite to three types of statements for which it is attempting to hold PwC liable: 1) the FYE 2000 audit certification; 2) Quarterly Reports (10–Qs)

from 2000 and 2001; and 3) certain press and earnings releases issued by Homestore. PwC concedes that its FYE 2000 audit certification constitutes a "statement" for which it would be potentially liable, but argues that this is the *only* statement for which it can be held liable under *Central Bank* and its Ninth Circuit progeny. Specifically, PwC argues that it did not "make" any other statements, and that the applicable case law dictates that in order for an auditor to be held liable under Section 10(b) and Rule 10b–5 for statements made by another, the auditor must have "substantially participated" in the creation or "making" of those statements. According to PwC, absent evidence supporting an inference of substantial participation, PwC's role in the Homestore accounting fraud can only be characterized as that of aider and abettor, for which *Central Bank* precludes liability.

■ The Court holds that "substantial participation" in the creation, drafting, editing, or making of statements is required to incur auditor liability under Section 10(b) and Rule 10b–5. Although the standard has not been so clearly stated in any post-*Central Bank* Ninth Circuit case involving auditor liability, the Court finds this be the appropriate standard for several reasons. First, in *Software Toolworks,* the Ninth Circuit examined certain letters sent to the SEC by the company's executives with the participation of the auditor. 50 F.3d at 628. The court determined that the letters contained falsehoods that should have been known to the company executives. As to the auditor, one of the two letters in fact stated that it "was prepared after extensive review and discussions with" the auditor, and "actually re-

ferred the SEC to two [auditor] partners for further information." *Id.* at n. 3. Circumstantial evidence also indicated that the auditor "played a significant role in drafting and editing" the other letter. *Id.* The court therefore held that "a reasonable factfinder could infer that, as members of the drafting group, [the auditors] had access to all information that was available and deliberately chose to conceal the truth." *Id.* at 629.

■ Second, a requirement of substantial participation in the creation, drafting, editing, or making of statements is required to distinguish primary liability from the aiding and abetting liability eliminated by the Supreme Court in *Central Bank.* Prior to the *Central Bank* decision, a plaintiff could establish secondary liability for an aider and abettor by establishing that the defendant (1) had actual knowledge of the fraud of another, and (2) substantially assisted in the violation. *Monroe v. Hughes,* 31 F.3d 772, 776 (9th Cir. 1994).[1] As a *primary* violation of the securities laws requires only recklessness and not actual knowledge, a holding that required participation approaching "substantial assistance" would have the effect of expanding primary liability beyond the scope of the no-longer-viable aider and abettor liability by requiring a lesser mental state. Plaintiffs must therefore show "substantial participation" in the creation, drafting, editing, or making of statements made by Homestore.

■ Plaintiffs are correct that a defendant can violate securities laws through deceptive *acts* that are not statements. *SEC v. Zandford,* 535 U.S. 813, 122 S.Ct.

1. PwC correctly points out that *Levine v. Diamanthuset,* 950 F.2d 1478, 1483 (9th Cir. 1991), cited by this Court in its prior order on the motions to dismiss, incorrectly states that aider and abettor liability required mere reck-lessness. Mot. at 7, n. 2. The mental state required for liability for aiding and abetting in the Ninth Circuit was actual knowledge. *Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 652 (9th Cir.1988).

1899, 1903, 153 L.Ed.2d 1 (2002) (broker held liable for conversion of securities from elderly person); *Cooper v. Pickett,* 137 F.3d 616 (9th Cir.1997) (independent manipulative or deceptive act of passing false information to analyst for dissemination to the public can constitute primary violation). However, the evidence relied upon by Plaintiffs in this regard does not support an inference that any of the alleged independent acts were manipulative or deceptive, and therefore in violation of the securities laws. (Opp'n to PWC Mot. #2 at 23). Thus, it is appropriate to confine the analysis to PwC's involvement in statements released by Homestore.

Having established the appropriate standard to be applied in the substantive law, the Court now turns to its application in the summary judgment context. Summary judgment is not warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. While the court does not weigh evidence on summary judgment, the court must make a threshold determination that the issue of fact is indeed "genu-

ine." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, the court takes allegations supported by direct evidence as true, and must make all reasonable and plausible inferences based on circumstantial evidence in favor of the non-moving party. *McLaughlin v. Liu,* 849 F.2d 1205, 1207–08 (9th Cir.1988). "Summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In the present case, therefore, the Court must determine whether Plaintiffs' evidence, after accepting direct evidence as true, and making all reasonable inferences based on circumstantial evidence in the light most favorable to Plaintiffs, establishes an issue of material fact as to whether PwC "substantially participated" in the creation, drafting, editing, or making of the various other statements by Homestore. These statements include both Homestore's 10–Q financial statements and various earnings and press releases made by Homestore.

a. *Participation in Homestore's 10–Q Reports to the SEC*

Plaintiffs assert that PwC substantially participated in the creation of the 10–Q reports to the SEC filed each quarter during the class period. The Court finds that the evidence presents a genuine issue of material fact regarding the scope of PwC's participation in the creation or editing of the quarterly reports. The evidence before the Court demonstrates the problems inherent in a system that allows an independent outside auditor to act as an ongoing accounting advisor. The evidence relied upon by Plaintiffs supports

an inference that PwC reviewed, commented on, and at least tacitly approved of the 10–Qs. The reasonable inferences drawn from the evidence could support a conclusion by a reasonable jury that PwC substantially participated in their creation, drafting, editing, or making. PwC touted its ability to provide valuable assistance in the structuring of transactions for the recognition of revenue as well as the accounting and reporting of the transactions so that the year-end audit would be clean. PwC was well compensated for its services, and its role in this regard should not be minimized.

First, Plaintiffs rely on global statements made during the deposition of former Homestore Chief Financial Officer Joseph Shew. Specifically, Shew stated that "just about every significant transaction was run by Pricewaterhouse Coopers to get their opinion as to whether [Homestore] would be able to recognize revenue before" each deal was completed (Ex. O, Shew Dep. 82:1–5)[2] and that "Pricewaterhouse was an integral part of the events that transpired at Homestore." (*Id.* at 525:23—526:7). The Court does not find these statements particularly helpful. However, a reasonable inference can be drawn from these comments that PwC was at least consulted regarding underlying transactions entered into by Homestore.

Next, Plaintiffs rely on evidence regarding PwC's commitment to provide "interim reviews to Homestore." PwC's engagement with Homestore called for PwC to "review a representative selection of advertising contracts in each quarter." (Whithey Decl. ¶ 32). A PwC report to Homestore dated February 3, 2000, states that it "worked closely with the company's financial management throughout the year in order to finalize the accounting for com-

plex transactions which require a fair degree of judgment and interpretation," apparently in reference to interactions in 1999. (Ex. Y, Stalick Dep. Ex. 2 at PwC(HMS)147384). Even though this document is referencing a time before the class period, it sheds light on the relationship that existed between auditor and client. Further, a PwC report to the audit committee states that "significant procedures" "are planned to be performed during our interim audit and rolled forward and then updated at year end." (Ex. 6 at PWS(HMS)147321). Michele Stalick, one of the Senior Associates on the Homestore "engagement," further described the interim review work when she testified that 10–Qs are reviewed and that PwC takes a look to "tie down financials to get support for the numbers and make sure that the numbers look correct based on the review that we had performed." (Ex. Q, Stalick Dep. 19:20–20:23). Each quarter, this review led to the production of an internal report at PwC that stated that the PwC advisor/auditor had "read the interim financial information in the 10–Q." (Ex. PPP, PwC(HMS) 106932–106933; *see also* Exs. QQQ, RRR, GG, HH, II). Each report then states that the "information reported appears to conform with the GAAP" and the "other information included in the Form 10–Q appears to be materially consistent with the information in the financial statements." (*Id.*) Plaintiffs rely on this evidence to show that PwC performed significant interim review procedures. The Court agrees.

Although not directly referenced by Plaintiffs, the letter of engagement between PwC and Homestore is also enlightening. In that letter, PwC committed itself to "perform reviews of the Company's unaudited consolidated quarterly financial

---

**2.** In general, citations to lettered exhibits refer to Plaintiffs' exhibits, while citations to numbered exhibits refer to Defendant PwC's exhibits.

statements and related data for each of the first three quarters" of 2000 before each 10–Q is filed, and "communicate to you for your consideration any matters that come to our attention ... that we believe may require material modifications ... to make it conform with generally accepted accounting principles." (Ex. 4). Although there are specific disclaimers as to the level of review that would be provided, this agreement is evidence of substantive interaction between PwC and Homestore on a quarterly basis, specifically in relation to the 10–Q statements.

Other PwC work papers further document the extensive interim review procedures undertaken by PwC. In what appears to be a chart of services to be provided to Homestore, PwC states that it will "participate in weekly (or more frequent) meetings with key management and function as a member of the team only with finance, business development and legal to establish structures that meet the Company's objectives." (Ex. 5, PwC(HMS) 010192–010196). PwC also agreed to "provide real-time feedback and conclusions on potential transactions. Roll-up our shelves [sic] and work side by side with the business development teams to proactively structure contracts to achieve the best accounting answer." (*Id.*). These services support an inference that PwC assisted in producing the numbers underlying the 10–Q reports, and thus participated in their creation.

PwC argues strenuously that mere "review" of quarterly statements cannot form the basis of a primary violation because it does not represent substantial participation in the drafting, creation, or editing of the statements. Yet what defines editing versus review is not a bright line. "Review" is in some ways editing with no comment and/or blanket approval. The scope of the review, the feedback given,

and whether the actions taken by PwC amount to substantial participation in editing the 10–Qs present factual questions regarding quantum of evidence, questions that must be determined by the trier of fact. The evidence described could form the basis for a reasonable jury's determination that PwC substantially participated in the making or editing of Homestore's 10–Qs.

### b. *Earnings and Press Releases*

Similarly, the evidence reasonably supports the conclusion that PwC substantially participated in the creation, drafting, editing, or making of at least the earnings releases, if not the press releases. Although the evidence does not show, as Plaintiffs assert, that PWC reviewed the actual press releases prior to their release, there is sufficient evidence of PWC's review and approval of earnings and revenue figures, for the purpose of ensuring their accuracy for inclusion in releases, to support a conclusion of substantial participation.

When the lead engagement Partner–in–Charge, Mr. Richard Withey, was asked, "Would you have looked at the earnings release before it went out, you, Pricewaterhouse?" he replied, "Yes." (Ex. S, Withey Dep. 143:9–11). Jennifer Campos, one of the members of the PwC audit team, explained further that she "worked on the company's earning releases" for 2Q and 3Q 2000 and 1–3Q 2001. (Ex. B, Campos Dep. 56:18—57:22). When asked whether this was to "assure that the earnings releases were accurate," she responded, "Yes. Or earning releases were reasonable." (*Id.*).

This testimony, combined with the evidence presented above relating to the level of interaction between PwC and Homestore, is sufficient to create an issue of fact as to the scope of participation in earnings and press releases.

### 2. *Scienter*

 PwC also challenges Plaintiffs' ability to demonstrate an issue of material fact as to PwC's scienter during the class period. The Court finds that scienter is inherently a factual inquiry, requiring a finder of fact to make a determination concerning what was known or reasonably should have been known to a person or persons at a particular time. The present case presents problems, not only concerning the issue of what was known to PwC, but problems relating to knowledge that accumulated over time. The same type of action or inaction that may not have been carried out with the requisite level of deliberate recklessness at one point in the class period may later be deemed to have the appropriate scienter because of knowledge acquired in the interim. In addition, this particular case presents issues concerning how much information was hidden from the auditor and what effect this had on PwC's scienter. These quantum of evidence issues are ones that are particularly unsuited to resolution on summary judgment.

 In order to establish liability under Section 10(b) and Rule 10b–5, Plaintiffs must demonstrate that Defendants acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1424 (9th Cir.1994). However, unlike the high pleading burden established by the Private Securities Litigation Reform Act ("PSLRA") under which a plaintiff must plead sufficient specific facts evincing a strong inference of "deliberately reckless or conscious misconduct," a plaintiff opposing a motion for summary judgment may rely on evidence of motive and opportunity to show an inference of scienter. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1063–64 (9th Cir.2000).

 In demonstrating scienter on the part of an auditor such as Defendant Pricewaterhouse Coopers, Plaintiffs are required to put forth evidence demonstrating that:

> the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002) (*citing In re Worlds of Wonder Sec. Litig.,* 35 F.3d at 1426–27).

 In the context of securities fraud by an auditor, therefore, the Plaintiffs must come forward with direct and/or circumstantial evidence sufficient to create an issue of material fact as to whether the auditor was deliberately reckless in performing the audit, i.e. whether there was "an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* "Summary judgment on the scienter issue is appropriate only if there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter." *In re Software Toolworks,* 50 F.3d 615, 628–29 (9th Cir.1994).

In *Worlds of Wonder,* the plaintiffs argued in cursory fashion that the officers of the company had violated Section 10(b) and Rule 10b–5 by issuing incorrect or misleading press releases and filings to the SEC. The court held, however, that in light of the evidence in the record, plain-

tiffs' allegations regarding scienter were made up entirely of speculative inferences arising from defendant's allegedly suspicious conduct. *Id.* at 1424–25. The court also held that an expert's conclusory opinion that accounting should have been done differently, on its own, is insufficient to create an issue of fact. *Id.* at 1425–26.

Similarly in *Software Toolworks,* plaintiffs provided circumstantial evidence that the auditor in the case knew about or recklessly disregarded errors in the financial statements when auditing the company. 50 F.3d at 627. Specifically, plaintiffs alleged that sales agreements were "poorly documented, informal and conditional," that certain "licensing transactions were risky," that management was "under extraordinary pressure for favorable earnings," and that the accountant obtained only oral confirmations of some agreements. *Id.* However, the court detailed the steps that the accountant took in preparing its audit and found that the allegations did not support an inference that the audit was reckless. *Id.* Finding that an inference of scienter would be unreasonable in light of the record, the court granted summary judgment in favor of the auditor: "At most, the evidence establishes that [the accountant] was negligent in auditing [the company], not that [the accountant] recklessly or knowingly falsified the financial statements." *Id.* at 628. In contrast, specific witness testimony indicated that the auditor had participated in drafting two erroneous letters submitted to the SEC. *Id.* at 629. The court held that the auditor's participation in the drafting could support an inference that the auditor had access to information that would have indicated the falsity of statements within the letters, and that a reasonable juror could infer that the auditor "knew or recklessly disregarded th[e] falsehood." *Id.*

Having established the appropriate legal analysis to be used, the Court now turns to the evidence put forth in the present case. In alleging scienter, plaintiffs rely heavily on evidence related to transactions that were later restated, including documentary evidence and the depositions of persons associated with those transactions. The Court must determine whether Plaintiffs' evidence, after accepting direct evidence as true, and making all reasonable inferences based on circumstantial evidence in the light most favorable to Plaintiffs, establishes an issue of material fact as to PwC's scienter during the class period. If the evidence and reasonable inferences therefrom indicate an issue of material fact, summary judgment is not appropriate.

### a. *Relevant Accounting Standards*

The Court takes note of some of the accounting standards that were implicated in the decisions that Homestore and PwC made. Although evidence demonstrating a failure to comply with the GAAP or GAAS is not determinative of the liability under Section 10(a) and Rule 10b–5, it is relevant. First and foremost, one of the principal issues in the late 1990s was how to properly account for "barter-type" transactions, in particular those transactions in which advertising was traded for advertising or bartered for some other service. In January 2000, at the beginning of the class period, the Emerging Issues Task Force ("EITF") issued EITF No. 99–17, entitled "Accounting for Advertising Barter Transactions." Such transactions could only be recorded if the fair value of the advertising surrendered in the transaction could be determined based on the company's own historical practices of receiving cash or cash equivalents for similar advertising sold to unrelated entities. (Ex. U, Costello Decl. at 4). Similarly, EITF 99–19, entitled "Reporting Revenue Gross as a Principal versus Net as an

Agent," was effective prior to the class period. This EITF addressed issues relating to reporting of revenue and established criteria used to determine when revenue was to be booked based on gross amount billed versus net amount retained. (Ex. U, Costello Decl. at 4). Most of the transactions that were restated, in particular those in FYE 2000 and early FYE 2001, were restated for failure to comply with these standards.

### b. *Analysis of Evidence*

In support of their assertion that PwC acted with deliberate recklessness in its interactions with Homestore, including its audit certification and its participation in the transactions and statements of Homestore, Plaintiffs generally rely on three basic categories of evidence: 1) characteristics of Homestore and its management known to PwC; 2) PwC's general day-to-day interactions with Homestore and PWC's "cozy" relationship with Homestore management, and 3) PwC's involvement with and approval of specific revenue generating transactions entered into by Homestore. Based on this evidence, Plaintiffs contend that a reasonable jury could find that PwC acted with the requisite level of scienter.

First, Plaintiffs present evidence of facts known to PwC that they argue should have caused PwC to look more closely at Homestore's transactions. Plaintiffs refer to certain risk factors under "AU 316.16–316.17." Particularly relevant to the present case are those relating to "Financial Reporting Risk." (*See* Ex. III, Withey Dep. Ex. 414 at PwC(HMS)182174–182174). PwC's analysis of Homestore indicated that there was unusually high

pressure to achieve accounting-based performing objectives, and that members of senior management had a major financial investment in the company, leading to an overall "Risk Attribute" of "High Risk—Management is under extreme pressure to improve earnings. Performance has a disproportionate effect on executive compensation." The Risk Attribute is defined as the "Incentive for Intentional Misstatements in Financial Reporting." Further, PwC was aware that Homestore's accounting practices were aggressive as opposed to conservative. (Ex. S, Withey Dep. 166:6–23; Ex. JJJ, Whithey Dep. Ex. 415 at PwC 182218).

Second, Plaintiffs present evidence relating to the relationship between PwC and Homestore. To the extent that the evidence presented above reflects on this issue, the Court hereby incorporates those discussions by reference. In short, that evidence supports a conclusion that PwC performed significant interim review work in addition to their in-depth year-end audit for FYE 2000. Plaintiffs also present evidence regarding the "cozy" relationship between members of the audit engagement team and the financial department at Homestore. This evidence potentially supports an inference of motive based on friendship, though not a particularly strong one.

Third, Plaintiffs present both general and specific evidence relating to PwC's involvement with the accounting practices on revenue transactions entered into by Homestore. In a more general context, former CFO Joseph Shew testified that nothing was hidden from PwC during the year 2000.[3] Regarding barter-type transactions, Shew stated, "[a]lso introduced in

---

**3.** Plaintiffs confine their discussion to the period encompassing FYE 2000 and early 2001, presumably because of the admitted increase in information that was concealed from PwC during the later part of the class period. The Court will focus its analysis on that period as well.

this time frame were new barter rules on your classic, 'You are going to buy advertising from me, but you are going to pay me in something other than cash.' That's a barter deal ... We had specific conversations on those kind of rules, and we had specific conversations per deal ... And we basically talked about the fact that they were simultaneously negotiated in terms of being back and forth." (Ex. O, Shew Dep. 81:1–12). It is reasonable to infer from this testimony that PwC was generally aware that some of the Homestore transactions were barter-type transactions.

In presenting evidence relating to specific transactions, Plaintiffs rely almost exclusively on the testimony of Mr. Shew.[4] For example, regarding the Dell Computer deal in late 2000 and early 2001, Shew testified that Homestore purchased computer equipment from Dell. Instead of taking the bulk rate discount, Homestore paid Dell full price, and in return convinced Dell to purchase advertising. After discussing the details of these transactions with Mr. Withey, Homestore booked this advertising money as revenue and did not link the transactions, though the money was really just recycled from Homestore's overpayment for the computers. (Ex. O, Shew Dep. 387:18–389:6). These transactions were later restated as "linked."

Next, Plaintiffs present evidence that Homestore invested large sums of money in small companies that would then purchase advertising from Homestore. (Ex. O, Shew Dep. 76:11—77:21). In fact, Mary Shelton Rose, one of the members of the PwC engagement team, testified that PwC had "an understanding that there were two transactions between two parties at or around the same time." (Ex. N, Rose Dep. 310:17–19). "Homestore would pay cash to a third party company as an equity investment," and cash would go back to Homestore pursuant to a relatively contemporaneous agreement. (Id. at 310:6–9). For example, PwC evaluated two contemporaneous agreements that Homestore had entered into with a company called Hometest in May 2000, one involving a $5 million investment by Homestore in Hometest, the other an agreement by Hometest to purchase $5 million in advertising from Homestore. (Ex. 120, PwC(HMS) 146317–146319). PwC recognized the reciprocal and contemporaneous nature of the agreements, yet approved the accounting of the agreements as two separate economic events. (Id.)[5] PwC allowed Homestore to realize the revenue from the sale of advertising. However, Hometest failed to pay any money under the advertising sales agreement, and by late 2000, Homestore had stopped recognizing these revenues. (Ex. N, Rose Dep. 269:18–21, 298:8–18). Nevertheless, PwC allowed revenues from the second and third quarters of 2000 to remain on the books as receivables, based on a representation from Homestore management that the money was still collectable. (Ex. B, Campos Dep. 170:19–171:24). PwC's acknowledgment of the reciprocal nature of the agreements, combined with the allowance of never-received revenues to remain on the books, could raise an inference of recklessness on the part of PwC.

4. The Court discusses a few specific transactions, though more are presented in Plaintiffs' materials.

5. Exhibit 120 is the PwC work paper analyzing the reciprocal Hometest agreements. Without a great deal of explanation, Ms. Campos recognizes that the transactions are contemporaneous and should be treated as barter, then concludes that the agreements should be considered two separate economic events. There appears to be a step or two missing in the logic of this conclusion, supporting an inference of complicity or recklessness.

Similarly, Plaintiffs provide evidence that PwC was aware of a series of purchases made by Homestore and a series of purchases made by another company, Classmates.com, occurring contemporaneously beginning in the third quarter of 2000. (Ex. S, Withey Dep. 419:3–21). PwC originally concluded that these were barter type transactions and should be treated as such, even though they were technically not a true barter. (*Id.*). Nevertheless, Homestore was able to convince PwC that they should be able to recognize revenue from the agreements. (Ex. HHH, Shew Dep. Ex. 387). Revenues from these transactions was later restated. (Ex. S, Withey Dep. 415:17–19). The Court is aware that PwC asserts that information was concealed from it in the treatment of the transaction. Nevertheless, the fact that PwC allowed unlinked revenue recognition even as it had originally treated the transactions as barter-type creates an issue of fact as to PwC's scienter.

Several other similar transactions are documented in Plaintiffs' briefing, including the Budget Trade Credit Barter deals and the Bank of America advertising deal, consummated during the last quarter of 2000 and first quarter of 2001. Each set of transactions involved money flowing both to and from Homestore for various services. Each time, PwC allowed revenue to be recognized even after deciding that the transactions were barter-type, often with questionable analysis and minimal follow up. In the Budget Trade Credit Barter Deal, Budget agreed to pay for Homestore advertising using "barter credits" from a company called "Active International." Although it had never beard of Active International before, PwC did very little to determine the value of the barter credits, and did not follow up on this transaction to verify that the credits were actually received by Homestore, even at the time of the FYE 2000 audit. (Ex. 39,

PwC(HMS) 022474–022475; Ex. M, Page Dep. 51:24–58:2).

Similarly, Bank of America agreed to purchase advertising "impressions" during the last two weeks of 2000. On January 2, 2001, Homestore entered into a broader agreement with Bank of America involving stock. There is disputed testimony as to whether the deals and their linkage was discussed with Mr. Withey of PwC. (Ex. O, Shew Dep. 204:25–205:24; Ex. S, Withey Dep. 61:16–23). In any case, PwC "considered the issue of whether the two agreements may be linked" "based on the close proximity of the negotiations and signing of the two agreements." (Ex. 38, PwC(HMS) 016022). Nevertheless, PwC determined the agreements to be independent based solely on representations by Homestore management. (*Id.*).

Each of these transactions was later restated. In each case, PwC claims that information was withheld from it that would have affected its decision on how to account for the specific transactions. But whether or not the true quid-pro-quo nature of the transaction pairs may have been kept from PwC, an inference can be draw that the accumulation of similar transactions of this sort should have alerted PwC to look more carefully at the transactions. While each individual transaction standing alone may not be enough to raise a red flag, the continuous string of similar transactions involving paired transactions of similar amounts could give rise to an issue of material fact as to PwC's scienter. This is especially true when combined with other evidence that PwC considered there to be a high level of risk that Homestore management would be inclined to intentionally misstate financial information.

■ Whether PwC's failure to uncover the true nature of these transactions soon-

er was excusable, negligent, or reckless, is a determination to be made by the trier of fact. This sort of quantum of evidence question, especially one that involves temporal accumulation of knowledge, is particularly unsuited to resolution by summary judgment. Examining the totality of the circumstances regarding the relationship between PwC and Homestore, what was known to PwC at the time, and its decisions to allow revenue that was later restated, the Court concludes that issues of triable fact exist as to whether PwC acted with deliberate recklessness in its business advice and auditing of Homestore.

### C. Control Person Liability

 Finally, PwC moves for summary judgment on Plaintiffs' claim that PwC was a "control person" under § 20(a). Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting a violation or cause of action.

Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). To prove control person liability, a plaintiff must prove (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator. *Howard*, 228 F.3d at 1065.[6] Control is defined as "the possession, direct or indirect, of

the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. This inquiry revolves around the "management and policies of the corporation, not around discrete transactions." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir.1996) (internal quotations omitted).

 Whether a defendant is a controlling person "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard*, 228 F.3d at 1065 (*citing Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir.1994)). A plaintiff "need not show a controlling person's scienter or that they culpably participated in the alleged wrongdoing." *Paracor Fin., Inc.*, 96 F.3d at 1161 (citation omitted). Once the plaintiff establishes that a defendant is a controlling person, the defendant then bears the burden of proving he acted in good faith, *id.;* good faith can be demonstrated if a defendant can show no scienter and an effective lack of participation. *Howard*, 228 F.3d at 1065.

In the present case, there is simply no evidence presented by Plaintiffs that could give rise to an issue of material fact as to PwC's liability as a control person. Plaintiffs' allegation that PwC was a control person and exercised "actual power or control" over Homestore management is presented in two broad categories—that PwC "participated in management decisions on a day-to-day basis," and that PwC "had

---

**6.** The Ninth Circuit had a different controlling liability test as set out in *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987) (plaintiff must allege that 1) the individual defendants had the power to control or influence [the company] and 2) the

individual defendants were culpable participants in [the company's] alleged illegal activity). The second prong of this test was overruled in *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir.1990); see also *Howard*, 228 F.3d at 1066, n. 10.

the power to control corporate actions." The evidence presented, however, does not support such broad allegations. Even taken on their face as true, the vast majority of Plaintiffs' proposed inferences would not support a claim of liability under Section 20(a). The Court will examine each assertion in turn.

### 1. Involvement in Management Decisions

In support of their assertion that PwC was involved in management decisions, Plaintiffs assert that 1) PwC's accountants and auditors had a preexisting relationship with Homestore officers, 2) PwC provided "extensive" services to Homestore in addition to auditing services, 3) PwC "was involved" in the day-to-day business of the company, 4) PwC informed Homestore about accounting rules, and 5) PwC had access to Homestore's financial information and nothing was hidden from then in the year 2000. On their face, these assertions cannot raise an inference that PwC was in control of Homestore's actions. Nevertheless, the Court will endeavor to examine each of Plaintiffs' contentions.

■ First, the pre-existing relationship between the PwC personnel and Homestore executives is irrelevant to the inquiry of whether PwC had "control" over Homestore's management decisions. The control person inquiry looks at the day-to-day affairs of the company, not pre-existing or even on-going personal or professional relationships between the control person and the purported controllee. Control person status cannot be inferred here.

Second, provision of services to Homestore is not an indicator of control. The activities described by Plaintiffs—providing business advice; serving as a consulting resource on financial, operations, business, and human resources issues; and assisting with obtaining financing—evidence service to a client, not control over management and policies. Control cannot be inferred here. Further, PwC's evaluation of Homestore's internal controls is part of a proper audit and cannot be the basis of control person liability.

Third, Plaintiffs' assertion that PwC was "involved in the day-to-day business of the company" is primarily supported by evidence that PwC gave advice to Homestore on a variety of issues, such as how to structure transactions so that revenue could be properly recognized, and that PwC reviewed transactions and accounting matters prior to their release to the public. Plaintiffs assert that the ability to review and "recommend changes" implies control. Again, the only reasonable and plausible inference from this type of evidence is professional accounting advisor and client, not an outside auditor directing the everyday affairs of the company.

■ Fourth, Plaintiffs assert that PwC's advice to Homestore regarding new and evolving accounting standards implies control. Advice does not amount to control.

Fifth, Plaintiffs assert that access to Homestore's financial records implies control. Specifically, Plaintiffs cite to testimony that indicates that Homestore officers "worked with [PwC] all the time" and that PwC's partner in charge of the audit, Mr. Withey, "was consulted with respect to how to structure revenue deals." The only plausible and reasonable inference to be drawn here is the existence of a relationship of company and client, and not one of control person and controlled person.

In sum, the Court finds that none of the evidence cited by Plaintiffs supports the broad contention that PwC was involved in "management decisions" in any regard other than as a professional advisor.

### 2. *Power to Control Corporate Actions*

■ Plaintiffs' evidence and allegations of PwC's power to control corporate actions are equally uninspiring. In support of this contention, Plaintiffs describe PwC's role in providing advice to Homestore on how to structure and recognize revenue in ten different transactions during 2000 and the first quarter of 2001. Specifically, Plaintiffs argue that "PwC had control over Homestore because if PwC disagreed with Homestore's final accounting treatment, it could refuse to provide an unqualified opinion on Homestore's financial statements, which would have been a problem for Homestore, but which could have uncovered the fraud." (Opp'n at 8).

A sampling of these allegations demonstrates their inapplicability to the control person liability analysis. Regarding specific transactions, Plaintiffs allege that PwC "worked directly with" Shew; "was giving Homestore advice;" was "consulted" by Homestore; "were very involved in the accounting" for certain transactions; "discussed . . . revenue recognition rules" with Homestore through "extensive dialogue;" "allowed Homestore to recognize" allegedly improper revenue after extensive discussions; "did not object to recording the revenues" from certain transactions and "did not question" others; and "reviewed the accounting treatment" of certain deals.

These are not the verbs of control. The only aspect of Homestore's business that PwC controlled was whether or not they would qualify their audit certification by disagreeing with the accounting of certain deals. This is simply *not* control of the day-to-day business affairs of the company, nor is it the power to control corporate actions. Indeed, much of Plaintiffs' evidence shows that Homestore's officers were not at all controlled by PwC. At best,

PwC's role was one of an influential advisor. Moreover, control must be demonstrated based on the "management and policies" of the company, not on discrete transactions. *Paracor,* 96 F.3d at 1162.

PwC's motion for summary judgment on liability under Section 20(a) is GRANTED.

### CONCLUSION

The Court concludes that issues of material fact exist regarding the scope of PwC's involvement and participation in Homestore's statements and its scienter during the class period. The Court therefore DENIES PwC's motions regarding primary violations and scienter. However, the Court concludes that there is no issue of material fact as to control person liability, and that Plaintiffs' evidence cannot support a conclusion that PwC exercised the requisite level of power and control over Homestore to incur liability under Section 20(a). The Court therefore GRANTS summary judgment in favor of PwC on the Section 20(a) claim.

The Clerk is directed to send a copy of this order to all counsel of record.